**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 04a0024n.06**
**Filed: October 13, 2004**

**Nos. 03-5943, 03-5490**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| TIMOTHY LAMONT DOBBINS and | ) | WESTERN DISTRICT OF KENTUCKY |
| TIMOTHY WELLS, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: GUY and SUTTON, Circuit Judges; CARR, District Judge.[*]

SUTTON, Circuit Judge. The defendants in this case are Timothy Dobbins and Timothy Wells, half-brothers and convicted co-participants in a Christmas Day robbery. Wells, who pleaded guilty at trial and admits his participation in the robbery, challenges only his sentence. Dobbins contests the introduction of evidence resulting from a "no-knock" police entry, the police's alleged failure to turn over potentially exculpatory material and his sentence. Because the district court correctly rejected each of these claims, we affirm.

---

[*]The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

I.

Around midnight of December 25, 2001, a man entered the British Petroleum gas station on Chamberlain Lane in Louisville, Kentucky, and asked to use the restroom. The key to the restroom had been lost earlier that evening and the lone store clerk, taking customer service to a new level, attempted to break into the restroom for the man. The clerk's good deed, however, did not go unpunished. The man, it turns out, was there to "peep the scene"—to ensure, in other words, that the coast was clear before a robbery. JA 297.

As the man asked the store clerk "goofy questions" and acted as though he were drunk, two other men entered the store, threatened the store clerk with firearms and demanded money. JA 226–27. One of the assailants proceeded to take about $400 from the cash registers and cash box and to fire his gun into the safe behind the counter in an attempt to open it. At the sound of the gunshots, the first man to enter the store darted outside. The other two men then went to the back of the store and removed the surveillance videotape and stole cigarettes and the receivers to the phones, before leaving the scene.

In the investigation that followed, several pieces of evidence indicated that Timothy Dobbins, Timothy Wells and an individual named Jerry Kelty had committed the robbery. First, suspecting that one of the perpetrators had returned to the store the following day and had discussed the robbery while posing as a police officer, the store clerk watched the surveillance tape from

December 26 and identified an individual who appeared on it as the gun wielder. That individual, the police determined, was Dobbins.

Second, a contact informed the police that Kelty had participated in the robbery. When the police questioned Kelty, he confessed to driving the getaway car for the robbery but insisted that he was an unwitting accomplice who was not otherwise involved in the crime. He claimed to know his accomplices only by their nicknames, "Loco" and "Bird." JA 244–46. After the crime, he added, the three participants fled to the residence of a former Jefferson County police officer named Kevin Richardson, where they watched, then attempted to destroy, the surveillance tape.

Based upon this evidence, the police obtained an arrest warrant for Kevin Richardson and a search warrant for his home. En route to serve the warrant, police officers observed Richardson in an SUV. They stopped the SUV, arrested Richardson and procured the keys to his house to facilitate the execution of the search warrant. Timothy Wells was also in the car with Richardson. Upon questioning, Wells admitted his role in the robbery and implicated both Kelty and Dobbins.

When the officers arrived at Richardson's house, they found the door unlocked and entered. The detective who first entered the residence, Bryan Arnold, could not recall knocking prior to his entry. (Arnold testified that he "announced police, search warrant and [ ] went on in" but could not "really recall" if he knocked, stating "I think [we did]—I'm not sure.") JA 372. Inside, the police found Dobbins and the items stolen from the gas station. They also recovered the remains of the December 25 surveillance tape, which they later were able partially to reconstruct. According to

the police, Dobbins at this point admitted to his involvement in the robbery and to his firing of the weapon, but Dobbins contests this admission on appeal.

In February 2002, a grand jury indicted Dobbins, Wells and Kelty for their actions during the robbery. The indictment charged Dobbins and Wells with the same three counts: robbery in violation of 18 U.S.C. § 1951(a), the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

At trial, Dobbins and Wells moved to suppress the fruits of the search warrant for Kevin Richardson's residence, including their confessions. The magistrate judge held a suppression hearing and recommended that the district court overrule the defendants' motions. Neither Dobbins nor Wells filed any objections to the district court's adoption of the magistrate judge's rulings. More specifically, Dobbins never challenged the search warrant on the ground that the officers violated the "knock and announce" rule.

Also at trial, the police introduced evidence about their efforts to reconstruct the tape. Detective Bryan Arnold noted that the reconstructed tape was of exceedingly poor quality, but that he believed he saw Kelty on the tape, though he could not be certain. Although Dobbins' counsel then noted that the defense had never been given a copy of the tape despite previous requests, he did not object to Arnold's testimony or request a copy of the tape. While the remains of the tape were introduced into evidence, the reconstructed tape was never played for the jury.

Following the results of the suppression hearing, Wells became a cooperating witness, submitted a guilty plea and entered into a plea agreement. As part of his plea agreement, Wells waived "the right to appeal any sentence within the maximum provided in the statute of conviction and the manner in which that sentence was determined on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatever, in exchange for the concessions made by the United States." JA 155, 202–06. The government, among other things, agreed to "consider making a motion pursuant to § 5K1.1 of the Sentencing Guidelines," which permits a downward sentencing departure when a defendant substantially assists the government in the prosecution of another individual. JA 154. "Whether or not to make such motion," the agreement added, "shall be in the sole discretion of the United States Attorney." JA 154. Shortly thereafter, the Department of Probation and Parole prepared a presentence report that recommended, among other things, a sentence for Wells of seven years on the § 924(c) use-of-a-firearm charge.

In April of 2003, the jury convicted Dobbins of all three counts of the indictment. At sentencing, Dobbins received 66 months on the first two counts, to run consecutively with a 120-month sentence on the third count, for a total of 186 months. Dobbins requested a downward adjustment for acceptance of responsibility based upon his "alleged" confession. The court found that Dobbins did not qualify for the acceptance adjustment because he disputed his guilt at trial.

At Wells' sentencing, the government recommended a ten-year sentence on the use-of-a-firearm charge and declared that it was not yet prepared to recommend a § 5K1.1 departure. The government claimed that they would make such a motion on the completion of the trial of another

individual, in which Wells was providing help. Wells argued that he should receive a § 5K1.1 departure, that the government should have adhered to the presentence report's recommendation of a seven-year sentence and that the presentence report overstated his criminal history.

## II.

On appeal, Dobbins raises three distinct challenges, all unavailing.

## A.

Dobbins first argues that the government should not have been permitted to introduce the videotape recovered from Richardson's residence and that the government should have turned over a copy of the tape prior to trial. We disagree.

For one, Dobbins' counsel agreed with the district court that Arnold's testimony regarding Kelty's presence on the videotape was "okay because no one is disputing that Kelty was there." JA 365. "An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990). For another, even if Dobbins properly preserved his argument, the standard by which we review discovery-rule violations under these circumstances is plain error, *see United States v. Barajas-Nunez*, 91 F.3d 826, 830 (6th Cir. 1996); *see also United States v. Olano*, 507 U.S. 725, 731–32 (1993) (error must be "plain" and "affect[] substantial rights"). Here, Arnold's testimony did not incriminate Dobbins, and the government did not play the tape at trial. Rule

16(a)(1)(E) of the Federal Rules of Criminal Procedure does not require production of the tape, but rather notice and availability for inspection, both of which Dobbins had. The district court committed no plain error in permitting Arnold to testify about the tape's quality.

Dobbins' argument that the government impermissibly failed to disclose the videotape prior to trial relies on *Brady v. Maryland*, 373 U.S. 83 (1963) (requiring disclosure of documents "material" to the preparation of the defense). The government, however, cured any violation by offering to give the videotape to Dobbins at trial. *See United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994) ("*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose."). Dobbins simply chose not to watch the tape.

### B.

Dobbins next argues that Arnold's no-knock entry into Richardson's residence invaded his privacy in violation of the Fourth Amendment. His argument fails for two independent reasons. First, Dobbins never raised the issue at trial and therefore waived it. *See United States v. Bonds*, 12 F.3d 540, 569 (6th Cir. 1993). Second, because Dobbins was a casual visitor at Richardson's residence, he did not have a reasonable expectation of privacy in the home and therefore lacked standing to raise the challenge. *See United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988).

C.

Finally, Dobbins argues that he should have received a downward departure under § 3E1.1 of the Sentencing Guidelines, which permits such departures when a "defendant clearly demonstrates acceptance of responsibility for his offense," because the trial court admitted his confession following capture. But throughout this proceeding Dobbins has contested ever making the confession and indeed contested his guilt at trial and continues to do so on appeal. While § 3E1.1 permits a defendant to gain a departure while still litigating legal issues, *see, e.g.*, *United States v. Fleener*, 900 F.2d 914 (6th Cir. 1990) (holding that a defendant's assertion of entrapment did not preclude an adjustment under § 3E1.1), Dobbins' conduct does not fall within this exception, *see* U.S.S.G. § 3E1.1, cmt. n.2 (stating that the "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt"); *United States v. Williams*, 940 F.2d 176, 181 (6th Cir. 1991).

III.

Wells challenges several aspects of his sentence, but his explicit waiver of his right to appeal the sentence precludes these challenges. *See United States v. Fleming*, 239 F.3d 761, 763–64 (6th Cir. 2001) (noting that "a defendant in a criminal case may waive any right, even a constitutional right, by means of a plea agreement") (quotation marks omitted). In his plea agreement, Wells waived the right to appeal any sentence within the statutory maximum as well as the manner in which the sentence was determined. Nothing indicates that Wells' sentence exceeded the maximum.

Nothing indicates that his plea was unknowing or involuntary. *See id.* at 764. And nothing indicates that the government, which promised only to "consider making" a downward departure motion, breached its plea agreement with Wells. *Compare United States v. Lukse*, 286 F.3d 906 (6th Cir. 2002) (requiring that the government move for a downward departure when the plea agreement stated that the prosecution would "make a motion" upon receiving substantial assistance); *United States v. Benjamin*, 138 F.3d 1069, 1074 (6th Cir. 1998) ("The use of [the word] 'will' [in the plea agreement] indicates that the parties did not intend that the government retain its discretion."). We therefore decline to address the merits of Wells' challenges to his sentence.

IV.

For these reasons, we affirm.